IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

VLASE PITAROSKI                          )
                                         )
          Plaintiff,                     ) Case No. 2:13-cv-00112
                                         )
     v.                                  )
                                         )
CAROLYN W. COLVIN,                       )
Commissioner of Social Security,         )
                                         )
          Defendant.                     )

OPINION AND ORDER

This matter before the court on the petition for judicial review of the decision of the

Commissioner of Social Security filed by the plaintiff, Vlase Pitaroski, on September 16, 2013.

For the following reasons, the decision of the Commissioner is **REMANDED**.

*Background*

The plaintiff, Vlase Pitaroski, filed an application for Disability Insurance Benefits on

September 14, 2010, alleging disability due to degenerative disk disease of the lumbar spine,

degenerative joint disease of the right knee, hypertension, and anxiety.   (Tr. 14, 17, 110-111)

Pitroski's application initially was denied on November 16, 2010.   (Tr. 61) Pitroski's request for

reconsideration was denied on February 7, 2011.   (Tr. 62) He then filed a request for a hearing on

February 24, 2011.   (Tr. 7-8) On November 18, 2011, he testified at a hearing in Valparaiso,

Indiana, before Administrative Law Judge (ALJ) William Sampson.   (Tr. 31-60) Vocational

Expert (VE) Thomas A. Grzesik also appeared and testified.   (Tr. 31-60) On December 9, 2011,

the ALJ issued a decision denying benefits.   (Tr. 9-23) Pitaroski filed a request for review of the

hearing decision with the Appeals Council on December 27, 2011, but his request was denied on February 6, 2013, making the ALJ's determination the final decision of the Commissioner. (Tr. 1-8) Pitaroski filed this action for judicial review of the final decision of the Commissioner on March 28, 2013.

At step one of the five step sequential analysis used to determine whether a claimant is disabled, the ALJ determined that Pitaroski had not engaged in substantial gainful activity since November 20, 2008, his alleged onset date. (Tr. 14) At step two, the ALJ found that Pitaroski had the following severe impairments: "degenerative disk disease of the lumbar spine and degenerative joint disease of the right knee." (Tr. 14) The ALJ also determined that Pitaroski had the non-severe impairments of hypertension and anxiety. (Tr. 14)

In this section, the ALJ explained his reasons for determining Pitaroski's hypertension and anxiety were not severe. (Tr. 14-16) In March 2011, Pitaroski was noted to have hypertension during an office visit at St. Clare Health Clinic[1]. (Tr. 14) Pitaroski was advised to go to the emergency room. (Tr. 14) There it was noted that Pitaroski had an episode of anxiety when he was in a crowd of people and developed a pressure-like chest pain. (Tr. 14) Pitaroski's EKG revealed poor R-wave progression and sinus rhythm, and a chest x-ray showed no acute changes. (Tr. 14) The following day, Piatroski had an exercise stress test. (Tr. 14) The test showed a normal hemodynamic response to exercise, and Pitaroski had no exercise-induced arrhythmias. (Tr. 14) In April 2011, at an office visit at St. Clare Health Clinic, Piatroski's hypertension was noted to be controlled. (Tr. 14) Pitaroski's biggest concern during that visit was his anxiety, and he was referred to the Regional Mental Health Center for an evaluation. (Tr. 14)

---

[1]St. Clare is a facility that provides medical services to low-income individuals at little or no cost.

Pitaroski attended a psychiatric evaluation in July 2011. (Tr. 15) Dr. Jose Ramirez, M.D., noted that Pitaroski did not appear dangerous to himself and could be managed on an outpatient basis. (Tr. 15) Pitaroski had a global assessment of functioning (GAF) score of 55 during the past 12 months, which is reflective of someone with only moderate difficulty in social, occupational, or school functioning. (Tr. 15) Dr. Ramirez prescribed a trial of Celexa, and Pitaroski agreed to try the medication but deferred therapy because of financial constraints. (Tr. 15)

The ALJ concluded that Pitaroski's mental impairments did not cause more than a minimal limitation on his ability to perform basic mental work activities. (Tr. 15) In the four broad functional areas known as "paragraph B" criteria, Pitaroski had a mild limitation in activities of daily living, a mild limitation in social functioning, a mild limitation in concentration, persistence, and pace, and no episodes of decompensation. (Tr. 15-16) The ALJ determined that Pitaroski's impairments did not meet or medically equal a listed impairment at step three. (Tr. 16)

In the area of daily living, Pitaroski had a mild limitation. (Tr. 15) He lived with his wife and two grown children. (Tr. 15) He was able to do some yard work, but he used a riding lawn mower to cut the grass. (Tr. 15) He spent most of his time at home, refraining from the use of drugs and drinking very little alcohol. (Tr. 15) He maintained his comfort by changing positions between standing and sitting. (Tr. 15) Based on that evidence, the ALJ found that Pitaroski had a mild limitation in activities of daily living. (Tr. 15)

In the area of social functions Pitaroski had a mild limitation. (Tr. 15) He was able to attend some social functions, including weddings and graduations, and was able to attend medical appointments while behaving in a socially appropriate manner. (Tr. 15) At a consultative medical examination, Pitaroski appeared to be cooperative. (Tr. 15) At the psychiatric evaluation,

Pitaroski interacted in a pleasant and appropriate manner, despite complaining of bouts of anxiety. (Tr. 15) Based on that evidence, the ALJ found Pitaroski had a mild limitation in social functioning.   (Tr. 15)

In the area of concentration, persistence, or pace, Pitaroksi had a mild limitation.   (Tr. 15) Pitaroski testified that he had a panic disorder.   (Tr. 15) He further testified that when he had a panic attack, he would have to leave the store or the crowded environment that he was in and withdraw so that he could be alone.   (Tr. 15) However, Pitaroski was able to attend the consultative examination, follow the proceedings without the need to be redirected, his speech was noted to be fluent, and his memory appeared to be preserved.   (Tr. 15) Based on that evidence, the ALJ found that Pitaroski had a mild limitation in concentration, persistence, and pace.   (Tr. 15)

In the final area of episodes of decompensation, Pitaroski experienced no episodes of decompensation of an extended duration.   (Tr. 15) Because Pitaroski's medically determinable mental impairment caused no more than mild limitations in the first three functional areas and no episodes of decompensation of an extended duration in the fourth area, it was deemed nonsevere. (Tr. 16)

The ALJ then assessed Pitaroski's residual functional capacity (RFC) as follows: "the claimant has the residual functional capacity to perform the full range of medium work as defined in 20 CFR 404.1567(c)."   (Tr. 19) In determining Pitaroski's RFC, the ALJ discussed all of Pitaroski's symptoms and the extent the symptoms reasonably could be accepted as consistent with the objective medical evidence and other evidence.   (Tr.16) In doing so, the ALJ followed a two-step process: first determining whether there could be a medically acceptable basis for his complaints, and second evaluating the "intensity, persistence, and limiting effects of the claimant's symptoms" to determine if they limited his work ability.   (Tr. 16-17)

The ALJ summarized Pitaroski's medical treatment for his symptoms consistent with degenerative disk disease of the lumbar spine and degenerative joint disease of the right knee. (Tr. 17) Pitaroski first sought treatment for back and knee pain in July 2010, and went to St. Anthony Medical Center. (Tr. 17) Radiology studies from that treatment only revealed early degeneration in the lumbar spine of the multiple upper lumbar disks, and the radiology studies of the knees revealed degenerative change and moderate narrowing of medial right knee joint and minimal narrowing of the lateral right and both sides of the left knee joint. (Tr. 17) In August 2010, Pitaroski went to St. Clare Health Clinic where he was diagnosed with mild effusion in his right knee, but he had no instability or tenderness upon palpation. (Tr. 17) He was prescribed Naprosyn. (Tr. 17)

During a consultative examination in October 2010, Dr. Rahmany Mohammed, M.D., noted that despite Pitaroski's complaints of low back pain and knee pain, Pitaroski was able to walk with a steady gait, did not use an assistive device, and could stoop and squat without difficulty, walk heel to toe and tandemly, and stand from a sitting position without difficulty. (Tr. 17) Dr. Mohammed also found that Pitaroski did not have any edema, stiffness, effusion, or atrophy in his lower extremities. (Tr. 17) Pitaroski had full range of motion in his cervical, thoracic, and lumbar spines, as well as full range of motion in each joint of his hips, knees, ankles, and feet. (Tr. 17)

In December 2010, Pitaroski returned to St. Clare Health Clinic complaining that he hardly could sit for a long time due to the pain in his back and knee. (Tr. 17) He was diagnosed with degenerative disk disease of the lumbar spine and degenerative joint disease of the knees. (Tr. 17) He was prescribed Celebrex and instructed to discontinue using Naprosyn. (Tr. 17) Pitaroski was advised to follow up for a Depo-medrol injection with Dr. Frederick Klepsch. (Tr. 17) During

2011, Pitaroski continued his treatments at St. Clare Health Clinic, where it was noted that he was not taking any medications for pain while he was awaiting the results of his Medicaid application. (Tr. 17)

Dr. Klepsch completed a Medical Source Statement.   In his opinion, Pitaroski was capable of low stress work.   (Tr. 17) Pitaroski also would require an absence from work one day per month.   (Tr. 17) Pitaroski was supposed to keep his legs elevated above the waist 25-30% of the workday because of knee and ankle edema, but this limitation was considered excessive by the ALJ when compared to the progress notes of Dr. Klepsch.   (Tr. 18-19) The progress notes were devoid of any directive to Pitaroski to elevate his legs.   (Tr. 18) Pitaroski also displayed no edema to his lower extremities during the consultative examination.   (Tr. 18)

The ALJ next stated that he did not find the allegations of Pitaroski fully credible.   (Tr. 18) Pitaroski testified that he left work in November 2008.   (Tr. 18) However, the earliest medical record in the file was from July 2010.   (Tr. 18) There was an 18-month lapse in time from the date that Pitaroski left the workforce to the time he sought out medical care for his impairments.   (Tr. 18) Pitaroski's allegations of disabling pain were not supported by the medical evidence.   (Tr. 18) The ALJ further explained that Pitaroski testified that his medications did not help the pain. However, he had discontinued use for a period of time. (Tr. 18) He testified that he still could mow the lawn if he used a riding lawn mower and that he had difficulty more with standing than sitting. (Tr. 18) Pitaroski made claims that he could not speak English, which was unsupported by the fact that he testified at the hearing without an interpreter.   (Tr. 18) The ALJ used this evidence in determining the allegations were not fully credible.

The ALJ gave little weight to the opinions expressed by Dr. Klepsch.   (Tr. 18) The ALJ found the limitations inconsistent with the progress notes.   (Tr. 18)   The ALJ also gave little

weight to the opinions expressed by the State Agency Medical Consultants in which they assessed that Pitaroski had non-severe physical impairments.   (Tr. 18) The ALJ found that the evidence at the hearing showed that Pitaroski was more limited than what was determined by the state agency consultants.   (Tr. 18) The ALJ gave significant weight to the opinions expressed by the consultative examiner, Dr. Mohammed.   (Tr. 18) The opinions were based on personal observations and face-to-face examinations of Pitaroski.   (Tr. 18) The ALJ found these opinions consistent with the record as a whole.   (Tr. 18)

At step four, the ALJ found that the RFC precluded the performance of past relevant work. (Tr. 18) Pitaroski had been a machine helper, which was semi-skilled work described by the DOT as heavy.   (Tr. 18) Pitaroski's RFC encompassed a full range of medium work, while the past relevant work was at the heavy level of exertion.   (Tr. 18) At step five, the ALJ further found that considering Pitaroski's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could perform; therefore he was not disabled.   (Tr. 19) The vocational expert testified that an individual with Pitaroski's background who was limited to medium work with no mental limitations could perform the following jobs: feeder-off bearer (3,000 jobs in region, 100,000 jobs nationally); industrial cleaner (8,000 jobs in region, 500,000 jobs nationally); and kitchen helper (6,000 jobs in region, 475,000 jobs nationally). (Tr. 56)

*Discussion*

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.   **42 U.S.C. ç 405(g)** ("The findings of the Commissioner of

Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); ***Kastner v. Astrue***, 697 F.3d 642, 646 (7th Cir. 2012); ***Schmidt v. Barnhart***, 395 F.3d 737, 744 (7th Cir. 2005); ***Lopez ex rel Lopez v. Barnhart***, .336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." ***Richardson v. Perales***, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 285 L. Ed.2d 852, (1972)(*quoting* ***Consolidated Edison Company v. NRLB***, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed.2d 140 (1938)); *See also* ***Shideler v. Astrue***, 688 F.3d 306, 310 (7th Cir. 2012); ***Jens v. Barnhart***, 347 F.3d 209, 212(7th Cir. 2003); ***Sims v. Barnhart***, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. ***Roddy v. Astrue***, 705 F.3d 631, 636 (7th Cir. 2013); ***Rice b. Barnhart***, 384 F.3d 363, 368-369 (7th Cir. 2004); ***Scott v. Barnhart***, 297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." ***Lopez***, 336 F.3d at 539.

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that he is unable

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

**42 U.S.C. ç 423(d)(1)(A).**

The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. **20 C.F.R. ç 404.1520**. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." **20 C.F.R. ç 404.1520(b)**. If he is, the claimant is not disable and

the evaluation process is over.   If he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental disability to do basic work activities."   **20 C.F.R. ç 404.1520(c)**.   Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. **20 C.F.R. ç 401, pt. 404, subpt. P, app. 1**.   If it does not, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" (RFC) and the physical and mental demands of his past work.   If at this fourth step, the claimant can perform his past relevant work, he will be found not disabled.   **20 C.F.R. ç 404.1520(e)**. However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy.   **42 U.S. C ç 423(d)(2); 20 C.F.R. ç 404.1520(f)**.

The first issue is whether the ALJ improperly assessed Pitaroski's mental impairment. Pitaroski argues that the ALJ erred by finding that his anxiety was not severe and did not produce any functional limitations and by failing to order that he be evaluated by a state agency psychologist or psychiatrist.   Pitaroski's medical record contained no assessment of the effects of his mental impairment on his ability to perform work-related tasks.   Pitaroski has concluded that his restrictions were based only on the ALJ's "lay understanding" of the medical evidence and the ALJ's unqualified understanding of how Pitaroski's impairment impacted his ability to function. Pitaroski also claims that the ALJ did not explain how his GAF score, 55 at its highest, was

indicative of moderate difficulties, but only minimally affected his ability to perform work. Pitaroski asks the court to reverse the ALJ's decision and remand the matter so that the ALJ could obtain a medical evaluation of his mental impairment.

"The ALJ has an obligation to develop a full and fair record, *see Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009); *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004), however, an ALJ is 'entitled to assume' that an applicant represented by an attorney is making his 'strongest case for benefits.'" *Perez v. Astrue*, 881 F.Supp.2d 916, 946 (N.D. Ill. 2012) (*citing Bowen v. Yuckert,* 482 U.S. 137, 146, 107, S.Ct. 2287, 96 L.Ed.2d 119 (1987)("[i]t is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so"); *Nicholson v. Astrue*, 341 Fed. Appx. 248, 254 (7th Cir. 2009); *Wilkins v. Barnhart*, 69 Fed.Appx. 775, 781 (7th Cir. 2003)); *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004)).   The ALJ uses discretion when he decides if and when to order additional evidence. *Griffin v. Barnhart*, 198 Fed.Appx. 561, 564 (7th Cir. 2006).   The ALJ may rely on the fact that the claimant has an attorney.   *Nicholson*, 341 Fed.Appx. at 254.

Considering that Pitaroski was represented by an attorney and had medical evidence on point, there was no obligation for the ALJ to order a state agency psychological evaluation.   The ALJ had medical evidence provided by Dr. Ramirez.   The vocational expert also testified as to the limitations of Pitaroski on his work capabilities if his limitations were as he claimed them to be. Pitaroski, therefore, should have provided information regarding his limitations that were more indicative of his mental impairment because he was in a better position to explain his medical conditions to the ALJ.   The ALJ considered Pitaroski's case for his disability benefits his strongest because he hired an attorney, so he was not required to request a state agency psychological evaluation.

Moreover, Pitaroski has not demonstrated that it was necessary to order a psychological evaluation because the ALJ found substantial evidence to support his assessment. Pitaroski challenges this, arguing that the ALJ supported his RFC assessment with his lay opinion. However, the ALJ did not make 'independent medical findings' or reject a diagnosis, but he relied on the medical evidence provided and Pitaroski's testimony. *See **Latkowski v. Barnhart***, 93 Fed.Appx 963, 972 (7th Cir. 2004) (finding the ALJ exercised discretion, and that an "ALJ has reasonable latitude in developing a complete administrative record. 'While it is true that the ALJ has a duty to make a complete record, this requirement can reasonably require only so much.'") (*quoting **Scheck v. Barnhart***, 357 F.3d 697, 702 (7th Cir. 2004)). The evidence provided to the ALJ showed that Pitaroski was able to attend the consultative examination and follow the proceedings without the need to be redirected. He was able to complete the entire psychiatric evaluation, and at the psychiatric evaluation, Pitaroski interacted in a pleasant and appropriate manner despite his complaints of anxiety. The psychiatric evaluation by Dr. Ramirez found only a mild limitation. The ALJ also noted that he was able to attend medical appointments and some social functions, such as weddings and graduations, and had only a mild limitation in social functioning.

Even if the ALJ erred, his error is harmless because the ALJ's findings were consistent with Pitaroski's testimony. *See **Schomas v. Colvin***, 732 F.3d 702, 707-08 (7th Cir. 2013) ("This kind of error is subject to harmless-error review, and we will not remand a case to the ALJ for further explanation if we can predict with great confidence that the result on remand would be the same."); ***McKinzey v. Astrue***, 641 F.3d 884, 892 (7th Cir. 2011); ***Parker v. Astrue***, 597 F.3d 920, 924 (7th Cir. 2010); ***Spiva v. Astrue***, 628 F.3d 346, 353 (7th Cir. 2010); ***Keys v. Barnhart***, 347 F.3d 990, 994–95 (7th Cir. 2003); ***Frank v. Barnhart***, 326 F.3d 618, 622 (5th Cir. 2003). At the hearing,

the vocational expert was asked to consider a hypothetical individual with Pitaroski's vocational background who was limited to medium work with no mental limitations. The vocational expert testified to three jobs: feeder-off bearer, industrial cleaner, and kitchen helper. With regard to his mental limitations, Pitaroski testified only that he needed to avoid crowds. The vocational expert considered the additional limitation of no crowds, and he testified that it would not have affected the jobs mentioned by the vocational expert. The ALJ relied on the vocational expert's testimony which explained that even if Pitaroski's allegations regarding the functional limitations caused by his anxiety and panic attacks were accepted as fully credible and incorporated them into the RFC finding, Pitaroski still would be able to perform a number of jobs. The vocational expert's testimony demonstrated that even if Pitaroski's alleged mental limitations were accepted as true, he still was not disabled.

Pitaroski also argues that the ALJ failed to consider that he would be off task 20% of the time. However, the ALJ addressed Pitaroski's claim of being off task 20% of the time during his analysis of his concentration, persistence, or pace. The ALJ noted that Pitaroski was able to attend the consultative examination, follow the proceedings without the need to be redirected, and his speech was noted to be fluent and memory preserved. Using that evidence, the ALJ found that Pitaroski had a mild limitation in concentration, persistence, and pace. This evidence is sufficient when coupled with the vocational expert's testimony that someone with the mental limitations to which Pitaroksi testified could perform substantial gainful activity.

Pitaroski also challenges the ALJ's consideration of his GAF score, arguing that it indicated that he had a moderate to severe impairment that would preclude him from working in crowds. The Seventh Circuit has acknowledged that a GAF score is "useful for planning treatment." *Griggs v. Astrue*, 2013 WL 1976078, at 9-10 (N.D. Ind. May 13, 2013); *Denton v.*

*Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (*quoting* Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders ("DSM–IV") 32–34 (4th ed. 2000)). However, the GAF score is a measure "of both severity of symptoms and functional level ... [and] always reflects the worse of the two, the score does not reflect the clinician's opinion of functional capacity. *Id.* (quoting DSM–IV at 33). The Seventh Circuit has held that "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Wilkins v. Barnhart*, 69 Fed.Appx. 775, 780 (7th Cir. 2003) (*citing* **Howard v. Comm'r of Soc. Sec.**, 276 F.3d 235, 241 (6th Cir. 2002); *Denton*, 596 F.3d at 425). The Social Security regulations do not dictate that the ALJ must determine the severity of a disability of a claimant based only on his GAF score, however, he may use the scores in the finding of the claimant's RFC. *Adams v. Astrue*, 2009 WL 1404675, at *4 (N.D.Ind. May 18, 2009).

The ALJ did not simply ignore Pitaroksi's GAF score. The ALJ noted Pitaroski's score and went on to explain that Pitaroksi did not appear to be a danger to himself or others. The ALJ further explained that Dr. Rahmany believed that Pitaroski could be managed on an outpatient basis. Pitaroski also was prescribed Celexa. In the past, Pitaroski deferred therapy due to financial constraints. Pitaroski's predominant complaint contributing to his GAF score was the anxiety he experienced in social settings. The ALJ addressed this by explaining the personal interactions between Pitaroski and a mental health professional, who found his limitation to be mild. The ALJ also discussed that Piotaroski could attend some social gatherings and medical appointments and behave in a socially appropriate manner. This court finds that the ALJ properly considered Pitaroski's GAF score.

The next issue is whether the ALJ improperly assessed Pitaroski's RFC. Pitaroski argues that the ALJ rejected all of the medical evidence. Specifically, the only medical evidence of how

Pitaroksi's severe impairments affected his RFC was Dr. Klepsch's opinion, which the ALJ rejected. Absent Dr. Klepsch's opinion, the only remaining evidence of his RFC was Pitaroski's testimony, which the ALJ fount not to be credible. Because the ALJ rejected both of these, Pitaroski asserts that the ALJ's decision was not based on sufficient evidence. The court will address these one at a time.

First, the court will consider the weight given to Pitaroski's treating doctor, Dr. Klepsch. A treating source's opinion is entitled to controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. **20 C.F.R. ç 404.1527(d)(2)**; *See also* ***Bates v. Colvin***, 736 F.3d 1093, 1099 (7th Cir. 2013); ***Punzio v. Astrue***, 630 F.3d 704, 710 (7th Cir. 2011); ***Schmidt v. Astrue***, 496 F.3d 833, 842 (7th Cir. 2007). The ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability." ***Clifford v. Apfel***, 227 F.3d 863, 870 (7th Cir. 2000) (*quoting* ***Scivally v. Sullivan***, 966 F.2d 1070, 1076 (7th Cir. 1992)); *See also* **20 C.F.R. ç 404.1527(d)(2)** ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

"'[O]nce well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight' and becomes just one more piece of evidence for the ALJ to consider." ***Bates***, 736 F.3d at 1100. Controlling weight need not be given when a physician's opinions are inconsistent with his treatment notes or are contradicted by substantial evidence in the record, including the claimant's own testimony. ***Schmidt***, 496 F.3d at 842 ("An ALJ thus may discount a treating physician's medical opinion if the opinion is inconsistent with

the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability."); *see e.g. Latkowski v. Barnhart*, 93 Fed. Appx. 963, 970 71 (7th Cir. 2004); *Jacoby v. Barnhart*, 93 Fed. Appx. 939, 942 (7th Cir. 2004).   If the ALJ was unable to discern the basis for the treating physician's determination, the ALJ must solicit additional information.   *Moore v. Colvin*, 743 F.3d 1118, 1127 (7th Cir. 2014) (*citing Similia v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009)).   Ultimately, the weight accorded a treating physician's opinion must balance all the circumstances, with recognition that, while a treating physician "has spent more time with the claimant," the treating physician also may "bend over backwards to assist a patient in obtaining benefits...[and] is often not a specialist in the patient's ailments, as the other physicians who give evidence in a disability case usually are." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006)(internal citations omitted).   *See also Punzio*, 630 F.3d at 713.

Dr. Klepsch was the only doctor to provide an opinion on how Pitaroski's impairments affected him.   The ALJ compared Dr. Klepsch's limitations with his progress notes and found inconsistencies between the two.   Dr. Klepsch stated that Pitaroski was supposed to elevate his legs 25% of the day because of edema, but his notes were devoid of a directive to elevate his legs. The ALJ also noted that Pitaroski did not display any edema at his consultative exam.   The ALJ discussed the inconsistencies and lack of support for the physician's opinions.   The ALJ was not required to analyze every factor.   *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996)("While we do not require a written evaluation of every piece of evidence, an ALJ must sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning. ")(*citing Carlson v. Shalala*, 999 F.2d 180,

181 (7th Cir. 1993)).   Because the ALJ identified and explained the inconsistencies between Dr. Klepsch's opinion and the record, the court finds this to be sufficient explanation.

Although Pitaroski argues that the ALJ rejected all of his medical evidence, the ALJ did not fail to discuss all of the medical evidence.   The ALJ discussed the radiology studies of the lumbar spine and the knees during the visit to St. Anthony Medical Center in July 2010.   The studies revealed only early degeneration of the multiple upper lumbar disks, while the studies of the knees revealed degenerative changes and moderate narrowing of medial right knee joint and minimal narrowing of the lateral right and both sides of the left knee joint. The ALJ further noted the findings in August 2010 at St. Clare Health Clinic of mild effusion to Pitaroski's right knee but no instability or tenderness upon palpation.

Based on his discussion of the medical evidence, the ALJ used his discretion and gave significant weight to the findings of Dr. Rahmany because his opinions were based on his personal observations and his face-to-face examinations of Pitaroski, and they were consistent with the record as a whole.   The ALJ supported his finding with sufficient evidence and discussed the findings of Dr. Rahmany from October 2010.   Pitaroski complained of low back and knee pain, however he was able to walk with a steady gait without an assistive device.   Pitaroski was able to stoop and/or squat without difficulty, and he was able to walk heel to toe and tandemly without difficulty.   The evidence further showed that Pitaroski had a full range of motion in his cervical, thoracic, and lumbar spines.   Pitaroski also had a full range of motion in each joint, and his strength was noted as 5/5 in all major muscle groups.   "[I]n the end, it is up to the ALJ to decide which doctor to believe - the treating physician who has experience and knowledge of the case, but may be biased, or the consulting physician, who may bring expertise and knowledge of similar cases - subject only to the requirement that the ALJ's decision be supported by substantial

16

evidence." ***Landing v. Astrue***, 2013 WL 1343864, at *4 (N.D. Ind. Apr. 3, 2013)(*quoting* ***Books v. Chater***, 91 F.3d 972, 979 (7th Cir.1996)).

Pitaroski next challenges the ALJ's credibility determination.   This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. ***Bates v. Colvin***, 736 F.3d 1093, 1098 (7th Cir. 2013); ***Schmidt v. Astrue***, 496 F.3d 833, 843 (7th Cir. 2007); ***Prochaska v. Barnhart***, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles his opinion to great deference.   ***Allord v. Barnhart***, 455 F.3d 818, 821 (7th Cir. 2006)*; **Nelson v. Apfel***, 131 F.3d 1228, 1237 (7th Cir. 1997).   However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference.   ***Steele v. Barnhart***, 290 F.3d 936, 942 (7th Cir. 2002). Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." ***Clifford v. Apfel,*** 227 F.3d 863, 872 (7th Cir. 2000).   *See also **Bates***, 736 F.3d at 1098.

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."   **20 C.F.R. ç 404.1529(a)**; ***Arnold v. Barnhart***, 473 F.3d 816, 823 (7th Cir.2007)("subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); ***Scheck v. Barnhart***, 357 F.3d 697, 703 (7th Cir. 2004).   If the claimant's impairments reasonably

could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical signs and laboratory findings, and statements from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]." **20 C.F.R. ç 404.1529(c)**; ***Moore v. Colvin***, 13-2460; ***Schmidt v. Barnhart***, 395 F.3d 737, 746-747 (7th Cir. 2005)("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence." **SSR 96 7p, at *1.** *See also* ***Moore v. Colvin***, 13-2460; ***Indoranto v. Barnhart***, 374 F.3d 470, 474 (7th Cir. 2004); ***Carradine v. Barnhart***, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits."). Rather, if the

> [c]laimant indicates that pain is a significant factor of his or her alleged inability to work, the ALJ must obtain detailed descriptions of the claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of the claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities. (internal citations omitted).

> ***Luna v. Shalala***, 22 F.3d 687, 691 (7th Cir. 1994); *see also* ***Zurawski v. Halter***, 245 F.3d 881, 887 88 (7th Cir. 2001).

In addition, when the ALJ discounts the claimant's description of pain because it is inconsistent with the objective medical evidence, he must make more than "a single, conclusory statement . . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." **SSR 96 7p, at \*2**. *See Zurawski*, 245 F.3d at 887; *Diaz v. Chater*, 55 F.3d 300, 307 08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence). He must "build an accurate and logical bridge from the evidence to [his] conclusion." *Zurawski,* 245 F.3d at 887 (*quoting Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). A minor discrepancy, coupled with the ALJ's observations is sufficient to support a finding that the claimant was incredible. *Bates*, 736 F.3d at 1099. However, this must be weighed against the ALJ's duty to build the record and not to ignore a line of evidence that suggests a disability. *Bates*, 736 F.3d at 1099.

Pitaroski challenges the ALJ's use of the boilerplate language. If the ALJ supported his credibility finding with other evidence, the use of the boilerplate language is irrelevant. *Allen v. Colvin*, 942 F. Supp. 2d 814, 822 (N.D. Ill. 2013) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Here, the ALJ provided such additional explanation.

The ALJ explained that Pitaroski's testimony that he mowed the lawn with a riding mower and had more difficulty with standing than sitting was inconsistent with his complaints of pain. The ALJ then discussed that Pitaroski inaccurately testified only that the swelling and numbness in his hands affected him only in the morning and did not persist into the work day. Pitaroski did not

provide any evidence to support his alleged hand limitation extending beyond the morning to the ALJ. The ALJ used this evidence to support his credibility finding.

However, in assessing Pitaroski's credibility, the ALJ also stated that Pitaroski testified that his medications did not help the pain but that he was not taking those medications prescribed to him. The ALJ also noted that there was an 18-month lapse in time between the time Pitaroski left work and he first sought medical treatment. The ALJ did not question Pitaroski about the reasons he either failed to seek treatment or did not follow the treatment plan.

A claimant's failure to follow a treatment plan or seek medical attention can decrease credibility when a claimant "does not have a good reason for the failure... of treatment," but for the ALJ to draw inferences about the claimant's condition from a failure to comply, an ALJ must first discern from the claimant the reasons for non-compliance. *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008)(failure to comply due to inability to pay for treatment, for example, may be an acceptable reason for non-compliance). *See also Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012)("Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference.")(*citing* **S.S.R. 96–7p**, **1996 WL 374186**, at *7; *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008)). If the ALJ decides to disregard the claimant's reason for failing to pursue treatment, the ALJ must provide an explanation. *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013) (explaining that the ALJ must elicit reason for failing to pursue medical treatment). Here, the ALJ did not make the requisite inquiry to discover the reasons Pitaroski either failed to seek treatment prior to July 2010 or to take his medications as prescribed. The ALJ must address this on remand.

Based on the foregoing reasons, the decision of the Commissioner is **REMANDED**.

ENTERED this 24th day of July, 2014

/s/ Andrew P. Rodovich
United States Magistrate Judge